# ATTACHMENT 1

Filed
D.C. Superior Court
08/27/2018 14:32PM
Clerk of the Court

## THE SUPERIOR COURT OF THE DISTRICT OF COLUMIBA
## CIVIL DIVISION

| | |
|---|---|
| James Dorsey | ) |
| 162 36th Street, NE, Unit 2 | ) CA: 2018 CA 006146 B |
| Washington, DC 20019 | ) |
|     Plaintiff | ) |
| | ) |
| Vs | ) |
| | ) |
| **District of Columbia** | ) |
| 441 4th Street, NW | ) |
| Washington, DC 20001 | ) |
| & | ) |
| **Raymond Jones** | ) |
| 910 17th Street, NW, Suite 800 | ) |
| Washington, DC 20006 | ) |
| **Officer William Dempster** | ) |
| Metropolitan Police Department | ) |
| Badge No. 5390, | ) |
| **Lieutenant Michael Pulliam** | ) |
| Metropolitan Police Department | ) |
| Badge No. L0181, | ) |
| **Officer Jonathan Lauderdale,** | ) |
| Badge No. 5120 | ) |
| **Officer Gregory Shiffer,** | ) |
| Badge No. 4498 | ) |
| **Officer Emma B Deoleo** | ) |
| Metropolitan Police Department | ) |
| Badge No.4668 | ) |

| | |
|---|---|
| **Officer Brock Vigil** | ) |
| Metropolitan Police Department | ) |
| Badge No. 3710 | ) |
| **Detective Anthony T. Campanale III** | ) |
| Metropolitan Police Department | ) |
| Badge No. D21593, | ) |
| **Detective Nicholas Smith** | ) |
| Metropolitan Police Department | ) |
| Badge No. D21532 | ) |

## COMPLAINT

Comes now plaintiff by and through Counsel Clarissa T. Edwards and CTEDWARDS, PC and files the complaint, as follows:

1. Jurisdiction of this matter is based on DC Code 11-921.
2. The plaintiff is an adult citizen of the District of Columbia and a United States citizen at all times relevant hereto.
3. The defendant, Raymond Jones, is a DC attorney doing business in DC at all times relevant hereto.
4. The defendant, District of Columbia, is a DC municipality doing business in DC at all times relevant hereto.
5. A police report shall serve as notice to the District pursuant to DC Code 12-309.
6. Officer William Dempster is employed as a police officer for the Metropolitan police department at all times relevant thereto and he prepared and swore under oath the search warrant application and participated in the planning and execution of the home raid.
7. The John Doe officers such as Lieutenant Michael Pulliam, Officer Emma B Deoleo, Officer Brock Vigil, Detective Anthony Campanale, Detective Nicholas Smith, and Jonathan Lauderdale

are the Metropolitan police officers who participated in the planning and execution of the home raid.

8. The Defendant had authority to control the conduct of said officers/defendants in paragraph 5-7 through under the doctrine of respondent superior and failed to control and supervise said officers.

9. The grand jury indicted the plaintiff on charges of firearm possession, unregistered gun and ammunition on October 9, 2013.

10. Prior to the indictment, the Defendant district obtained a search warrant to raid the home of the plaintiff at 4701 Alabama Avenue, SE. The basis of the warrant was to investigate into the alleged theft of purses by Francis Taylor who is the cousin of the plaintiff. The warrant application describe that on June 3, 2013 that 9 purses were stolen from a store in Leesburg, V.A. The warrant also indicates that two suspects were seen departing in a vehicle titled to two people one of which was Mr. Taylor. There was no information in the warrant application does not have any facts that would create a likelihood of finding evidence of any crime in the plaintiff's home where Mr. Taylor did not reside. "The warrant application also states that officer Dempster learned that individuals will store stolen goods at their residence or in vehicles which they have access and control along with photographs, Officer Dempster failed to expound on why the purses would be located in the particular home listed on unspecified vehicles record of one or more suspects or why purses are the type of stolen goods likely to leave a trial of electronic and paper records, photographs. Defendant Dempster further indicates in the warrant application that cell phones are commonly carried on the persons to communicate with each other. In light of this language in the warrant application, no reasonable officer would believe that the four cell phones taken from the plaintiff's home would belong to Mr. Taylor or contain any evidence of any theft of purse. No reasonable officer would therefore have believed that the officers had a basis to seize the cell phone of the plaintiff and his family. "

11." Defendant Dempster further states that based on his knowledge, training and experience. He knows that the type of computer stored information that the sought often requires technical expertise to identify the appropriate files containing evidence of crime and to discover hidden files. There are no facts provided by officer Dempster to suggest that the computer and cellar phone which he seized from the plaintiff's home contain hidden files and to discover hidden files. Defendant Dempster also did not provide any facts to suggest that the theft of purses is the type of incident that would necessitate search of a suspected person's technological storage device, including the electronic devices of any family members"

12. As previously noted, the defendant Police Officers, came to the home of 4701 Alabama Avenue on June 7, 2013. At that time, the plaintiff and other family members were on the balcony which opens to a main room which consist of a living room and a day room. That room contains a door to the balcony. There is a small kitchen, and hallway that leads to bedrooms and bathroom in the back. Officer Campanale, testifies at the Plaintiff's trial that as he entered he saw the Plaintiff "exiting the kitchen area" just off of the living room area. He was ordered to the ground and handcuffed. Officer Ranck entered after Officer Campanale. He claims that he ordered the Plaintiff on the ground in handcuffs outside the threshold of the kitchen. Officer Ranck did not see the Plaintiff leave the kitchen.

13. The Plaintiff was the only one arrested, but everyone in the apartment was handcuffed including two adult, a juvenile male, and a female child. The juvenile male was in the bedroom, about fifteen feet from the kitchen. At some point, an unidentified officer in the kitchen announced that he had a gun. Officer Campanale nor Officer Ranck identified what officer found the gun or knew exactly when.

14. Officer Dega, a crime scene technician, took several photos of the scene and they were admitted into evidence at trial. Officer Dega did not discover the gun either but someone pointed it out to him in the cabinet. Officer Dega photographed the gun and did not know whether another officer

touched the weapon before he got there. He took the gun from the top shelf of the cabinet and placed it on the countertop to take more photographs.

15. He did not remember what else was on the countertop but the photograph he took showed other items, including a pill bottle. He put the loaded revolver in a paper bag along with four cell phones and a laptop recovered from the apartment and put the bag in the trunk of his vehicle. Once at the Sixth District, he gave the gun to another technician, Valerie Campbell. Officer Dega admitted he had no specific protocol to collect evidence or to preserve DNA evidence.

16. "Officer Dega also stated that he had moved the gun from its original place. He prepared a PD-81 property for other items collected at the scene on June 7, 2013, but he did not included the gun in that form.

Valerie Campbell testified she reported to the Sixth District station at 8:55 pm. Officer Dega gave her the gun and she processed it, took photos of the gun and ammunition, put them on the property book for evidence, and submitted the gun to the chemical lab for further processing. She filled out a PD-81 form for the gun and ammunition. She did not swab for DNA or collect fingerprints.

17. Ms. Borchardt-Gardner, a senior forensic DNA specialist who was a witness for the United States government testified generally about DNA and DNA analysis. She testified at trial that DNA tests cannot determine how long the DNA has been on the object tested. Ms. Borchardt-Gardner talked about DNA transfer. She specifically testified that a person can transfer DNA to an object by holding it, which is known as primary transfer. DNA can also be transferred through secondary transfer to a location where the source of the DNA did not emanate from originally. If someone bleeds on the floor, another person could step on the blog and then transfer it. She read an article about transfer from one object to another but never saw it herself. DNA profile at 8 of 15 locations, but the plaintiff's son would have 50% of his DNA.

18. Prior to Ms. Borchardt-Gardner testimony, the prosecutor sent defense counsel an email message disclosing for the first time that the expert was currently engaged in a romantic relationship with

Assistant U.S. Attorney's Office. Refusing to dismiss the case, the trial court noted "That's an issue you can cross examine on." The defendant herein failed to question Ms. Borchardt-Gardner about the relationship with the U.S. Attorney"

19. Later that day, the plaintiff asked to approach the bench. Part of the colloquy that followed related to Ms. Borchardt-Gardner's romantic relationship with someone in the U.S. Attorney Office. The following Monday, when Ms. Borchardt-Gardner was no longer available, the trial court explained that the plaintiff "was concerned that the defendant Jones had not cross-examined the DNA expert on the issue of her relationship". The court determined that the issue was relevant and the plaintiff had a right to cross-examine about it.

    The court further stated to Defendant Jones, defense counsel, "the reason why we are dealing with this is because you did not ask about it and quite frankly, I am not on the Court of Appeals but I think it could be reversible error."

20. During the cross examination at trial, the plaintiff repeatedly raised concerns about the fairness of the trial and defendant Jones' representation. A few days later, the plaintiff voiced concerns to the Court about Defendant Jones' cross-examination of Officer Ranck. ."

21. Later on January 26, 2015, at the conclusion of the government's case, another issue arose concerning Defendant Jones' performance. Defendant Jones announced an intention to call an expert witness" to clear up some DNA matters. He acknowledged that in a January 12 email to the prosecutor he did not set out the basis for his expert's opinion in accordance with Rule 16. He said he had told the plaintiff that they needed an expert. He also asserted that the plaintiff had told him he would come in with money to hire DNA expert but did not and "at one point, he said that he did not want it because he could not afford it." As a result, defense counsel had told the prosecutor that they would not have an expert after all. He continued, "I really need a DNA expert. The plaintiff explained to the trial court that he is indigent and that he believed that he had paid defense counsel enough money to pay for half the cost of a DNA expert. He described a previous conversation with Defendant Jones where he told him to hold on to money and said "I am going to request that

inside of your trial because we got contamination issues and that's the reason why it's going to give us time to get a DNA expert."

22. The court offered to consider letting the plaintiff call a DNA expert despite defendant Jones' failure to comply with Rule 16. They would have provide the basis of the expert's opinion to the government by 9 pm that night, and the expert would have to be available by 10:45 the next morning. Defendant Jones said that he would try to get in touch with his DNA expert to come in the next day.

23. On January 27, 2015, the Defendant Jones reported that his DNA expert was unavailable that day but could come the following day; he had also contacted another company that was unavailable that day. The trial court expressed a willingness to sign a voucher "for the plaintiff so that he could have a DNA expert. The plaintiff had previously qualified for representation when he was represented prior thereto by the Public Defender Service, in the case. Also, the court was willing to sign a voucher based on some comments that the court heard about money during the trial and how that potentially impacted the issue of the DNA expert." The court concluded, however, that because the expert was unavailable they would proceed to trial without the expert. Defendant Jones also did not move to suppress the search warrant although it was defective. He also did not file a Rosser letter which is required under the rules upon information and belief.

24. The Plaintiff was convicted of three years in prison as a result of the failure of Defendant Jones to provide effective representation and the defective warrant.

25. The defendant Jones failed to provide a defense for said case. He failed to note an expert. He further failed to timely note an expert to challenge the DNA testimony of the government. He failed to question the search warrant. More onerous of the fact that the search warrant was defective is that another Court held that the warrant was defective. The government settled a lawsuit regarding the search warrant in said case.

Defendant Jones also failed to cross exam the United States expert on her romantic relationship with a US Attorney. He failed to call any witnesses on the behalf of the plaintiff. A reasonable attorney would not have acted in such a manner.

26. There is a reasonable probability that the outcome of the trial would have been different if defense counsel had sought a voucher for funds to hire a DNA expert, consulted with and presented testimony by that expert, cross-examined the government's DNA expert for bias interviewed and presented testimony by Nika Dorsey and Jonte Watts, and moved to suppress the gun as unlawful. As a result of Defendant's conduct, the plaintiff is damaged. The defendant is the proximate cause of the Plaintiff's damages. The Defendant Jones knew or should have known that the aforementioned conduct would cause harm to the plaintiff. The action did in fact cause said harm. As a result of his conduct, the plaintiff was harmed.

27. The plaintiff is therefore damaged in the amount of four million dollars plus attorney fees and cost.

28. "The Defendant Metropolitan Police Department has established a pattern and practice, and policy of training its officer to include in search warrant application statements of training and experience that are unsubstantiated, vague, insufficient to substitute for actual evidence, false and misleading. MPD has established a pattern and practice of training officers to use statements of training and experience about the habits of criminal as a purported substitute for evidence of police investigation into any evidentiary link to a particular residence. Although, they are aware of the factual and legal flaws in the statements, they continue to instruct it officers to obtain search warrants raids based on training and experience based statements. The defendant district also trained officer to not include the high failure rate of officers to uncover such evidence in their search warrants. The MPD also has failed to properly train and or discipline an officer who repeatedly prepare and execute legally invalid search warrants. The defendant district failed to properly train and to supervise its officers on the 4th amendment standard for obtaining highly

instructive search warrants. Said grossly and reckless and unlawful searches have become the reality of thousands of poor families of color. "

29. The defendant MPD officers executing said warrant failed to knock and announce their presence prior to destroying the door and bursting into the plaintiff's home and there were no exigent circumstances.

30. The defendant officer raided the home unlawfully searched the home and its occupants. It not only frightened the minor children, and the handcuffing and searched of the plaintiff, wife in front of their 3 year old child for vague characterize evidence. Notwithstanding the defendant officers knew that Mr. Taylor did not reside on said premise. They repeatedly seized and search family. Although, they knew that that they did not pose any threat or danger. The MPD invaded the privacy of the plaintiff by seizing his electronic devices which contained his personal and intimate information. This unreasonable, wanton and reckless, seizure and searches reflex a pattern and practice of MPD officers in several hundreds of similar search warrant raids. This also demonstrates that the defendant MPD failed to properly, train, supervise and discipline it officers concerning proper execution of search warrants. These unlawful, unwarranted search and seizures of innocent people is in violation of the 4th amendment and shocks the conscience and common decency.

Wherefore the following the plaintiff seeks the following relief:

A judgment against the defendants in the amount of four million, plus cost and attorney fees;

Any and all relief deemed proper by this Court.

Respectfully Submitted,

/s/ Clarissa Thomas Edwards

Clarissa Thomas Edwards #434607

CTEDWARDS, P.C.

840 First Street, NE

3rd floor

WASHINGTON, DC 20002

(202)248-5020

Clarissatedwards@ctedwardspc.com

## VERIFICATION

I, James Dorsey, hereby verify that the information in the complaint is true and accurate to the best of my recollection and belief.

_____
James Dorsey

Subscribed and sworn before me this 20 day of July 2018

_____
Notary

My Commission expires on May 23, 2022